Good morning. May it please the Court, Matt Clasey on behalf of the Oregon Natural Desert Association, or ONDA. With me at council table is David Becker. I'll try to reserve three minutes of my time for rebuttal. Steens Mountain in southeastern Oregon is a place so unique that Congress 20 years ago decided it should be managed in a more protective manner than surrounding public lands, directing BLM to manage the mountain to protect its long-term ecological integrity above all else. BLM's failure to prepare an EIS for its motorized travel plan was fatal under NEPA, not just because Steens is an ecologically critical area, but also because of the extraordinary controversy and uncertainty over BLM's existing roads assumption and the scope of the project's impacts. As this Court explained in Anderson v. Evans in 2004, no matter how thorough, an EA can never substitute for an EIS if the proposed action could significantly affect the environment. And the result of the uncertainty here is that there is simply no way for BLM, let alone the public, to truly understand the environmental consequences of maintaining or improving or closing hundreds of miles of so-called roads BLM decided to designate for motorized use and mechanical maintenance. And there's no serious dispute on the record here about the negative effects that roads can have on wild lands and on wildlife habitat. It seems to me that the dispute is where the roads are and what they are. That's exactly right, Your Honor. And in this case, during the NEPA process beginning more than a decade ago, ONDA went out and, using BLM's own inventory protocol and forms and methodology, surveyed more than 200 miles of roads because ONDA suspected, based on its long-time use and understanding and enjoyment of Steens, that a lot of these roads didn't exist at all, or if they did, they were so primitive and had been naturally reclaimed through non-use over the decades that BLM's one-size-fits-all existing roads assumption just didn't comport with the reality on the ground. Here, I have a sort of question about the sort of structure of all of the arguments in the case. If we were to agree with you that there is an inadequate baseline description of the environmental conditions of the roads or purported roads and that, therefore, the NEPA analysis is insufficient, wouldn't we stop there and remand rather than going on to consider the other issues? That's the order I briefed it, Your Honor, but I would actually flip it for today's purposes. I think the EIS issue is the critical issue, and it's because— But how do we know if there has to be an EIS if the analysis is sufficient to assess it? Because I guess I just don't see how, if the analysis is sufficient to determine that, then I don't see how you went on the baseline question, but vice versa also. Well, let me put it this way, Your Honor. The EIS issue turns on context and intensity, of course, and the context is Steens Mountain. Like in Anderson v. Evans, where the context was impacts to a local population of whales off the coast of Washington, or like in the National Parks case that we cited that the D.C. Circuit decided last week, the context was the historically important, congressionally protected James River corridor. This is a heightened management area on Steens Mountain. I understand that, but if the NEPA analysis is insufficient, and we presume that a correct new one would be made if that's the way that we were to go, and that new analysis could involve an EIS without our ordering it to do so, and I guess I don't understand why that isn't, in terms of our jurisprudence, the way we would normally decide the case. Well, I think because the record here is so clear that there's such a high level of controversy and uncertainty, the ONDA reports used BLM's own methodology, which the agency ignored or decided not to use without an explanation, and fundamentally disputed BLM's assumption that all 521 miles of these roads exist on the ground. So, and another variant of the same question, though. You then, after the NEPA analysis, have a series of substantive arguments. Do we need to address those if we were to, in one way or another, decide the NEPA case in your favor? I mean, in particular, there's a Steens Act controversy, as I understand it, about what's a road. Is that logically prior to all this? In terms of what would be in the EIS or the EA, in terms of what it is they have to be looking at? I think the court doesn't necessarily need to reach the Steens Act and the Federal Land Policy and Management Act issues if it decides the case on the basis of one or both of our articulations. At the end of the whole process, the Appeals Board, ILPA, what's it called, ILPA? The IBLA. The IBLA has now decided that a road is anything that there's a record of and it doesn't have to be on the ground. Now, does that have an impact on what's going to be analyzed in the EA and EIS, such that we need to know the answer to that question before you can usefully, or else they could do an analysis on that basis and then you can come back and say, but that's the wrong basis because that's not what a road is. And that might be the inevitable way it goes. Although I would point you to the National Parks case, the D.C. Circuit's decision from last week, where it decided an EIS was necessary and the EA and FONSI were insufficient, ordered an EIS, but then did go on to interpret the meaning of one provision in the Preservation Act that was at issue there in order to, as that court described it, facilitate the Corps' NEPA review in its EIS that was ordered by the court. So I think this court could take the same path and decide that BLM violated NEPA by not preparing an EIS because of the uncertainty generated by the incomplete and inaccurate baseline, and reach, for example, the Steens Act claim because in more than 40 years of managing public lands, BLM has never defined or interpreted a road as being something that exists only on paper. You say the problem with the NEPA analyses are that they weren't taking the appropriately close look at what they say are the roads. Particularly in light of data that undermined their assumption. But if their analysis is that, as I understand it, their ultimate analysis is, well, all of these things, however they look on the ground, are roads for Steens Act purposes because they're a historical record of them, and therefore we're not, one of their arguments is we're not actually changing anything by our decision, and that seems to be a ground-level part of why they say there's no significant impact. So how, without knowing what a road is, do we analyze that? Well, the record, Your Honor, is fully developed, and the law is there to be applied in terms of determining whether the Board of Land Appeals' newly announced matter-of-record definition of a road in 2014 was reasonable or not. I understand that, but what I'm trying to understand is how it interacts with the NEPA analysis. Well, it's almost step two, Your Honor, because under NEPA it doesn't matter what the definition of a road is. It could be anything. It could be matter-of-record. But under NEPA the key is that BLM needs to go out and determine the on-the-ground environmental effects regardless of what is a road. That's right. In order to decide which roads to leave open. That's right, because the But if it's not a road, then you couldn't leave it open, and they wouldn't have to look at it anyway. It just wouldn't leave it open because it's not a road, and you're not allowed to have any extra roads. And no matter what the route's called, the environmental consequences of allowing motorized use on it or of allowing mechanical maintenance like that that we showed in Figure 1 of our brief are dramatic. In a funny way, it seems like if the 2014 definition of a road is basically anything that exists on paper, is the definition, then the environmental assessment or EIS is even broader because it means more things are roads than are actually found on the ground. So, I mean, it almost increases the task of determining the environmental impacts rather than decreases it. That's right. If anything, it does increase the task. And I would point the court specifically to ER 1027. That's the 2005 General Land Use Plan for Steens Mountain. And there, BLM defined a road as something that is maintained for regular use and can be reasonably and prudently driven. Now, if you compare that definition to ER Volume 4, which is ONDA's example report of 80 or so different routes, a lot of those photographs show places that simply cannot be reasonably and prudently driven, at least not without doing extreme... As I understand it, one of the major determinations to be made in the travel plan is which roads are to be subject to maintenance. Is that right? That's correct. And the maintenance, if it's authorized for Level 2 maintenance, which you say involves mechanically grading a road and brushing roadside vegetation, and I will ask the government more about that, then is there any other authorization that's needed, or could BLM just go and take anything that it designates to be a road and essentially clear everything off and make it into a much more sophisticated dirt road? That's correct. And there's no other process that needs to be gone through? That's right. In the situation with Burnt Car Road, BLM relied upon its authority from this travel management plan and issued... And didn't have to go to any more environmental analyses or anything else? No more public review underneath, but at most a work order was issued and the work was done. So that's why this really is a critical piece here, not just with regard to where vehicles are allowed to drive, but absolutely with regard to the maintenance levels that are authorized. Has ONDA specifically suggested, or has anybody,  Yes, although I would say ONDA's focus has been on avoiding any maintenance at all on the most primitive routes, in other words, allowing them to be maintained by use as people travel on them, as opposed to the types of far more significant maintenance that we saw on Burnt Car Road. You saw the photographs in Figure 1 of the brief. There was hardly anything there at all before that work was done. It was a dramatic change. And for me, it comes back to the fact that these are significant environmental consequences. The degree of controversy and uncertainty were so great that there's no question on these facts in this particular place, Steens Mountain, at an EIS. The other thing that feels like a void to me in this case so far is that the controversy or the debate has been around whether the baseline account of the roads is sufficient, but it seems to me that has to be with some reference to what it is you're looking at. And unlike most environmental cases, there doesn't seem to be a focus of what the environmental concerns exactly are. I mean, there is some discussion of sage-grouse, but that's not really the focus. So I'm having a hard time understanding what it is you're supposed to be looking for. I agree, and I think that stems directly from the fact that BLM used this sort of existing roads one size assumption, whereas if the agency had taken a more granular look at the actual baseline condition of each of the routes it wanted to designate for driving or for maintenance, then the agency, let alone the public trying to review the agency's work, would have had a- But what's the substantive standard ultimately here? Or what are the environmental concerns they're supposed to be looking at or they are looking at? Well, under the Steens Act, it's long-term ecological integrity. Under the Federal Land Policy and Management Act, it's unnecessary or undue degradation, including applying the minimization criteria on a route-by-route basis, as this Court held in Wild Earth Guardians. And there are wilderness areas, too, which have wilderness criteria. Wilderness study areas, that's correct, Your Honor. I see I've run past my time. You have, but you may have a minute for rebuttal when the time comes. We've asked you quite a few questions, and we'll hear from the county next. May it please the Court, Dominic Carollo for Harney County. I'd like to try to reserve one minute of my time for rebuttal, if I may. I'd like to start by briefly reminding the Court what we're talking about here. We're talking about one of the most remote and desolate regions of the contiguous United States. We're talking about a county with 8,000 permanent residents. And we're talking about motorized roads and trails that have primarily been established through the passage of vehicles, and not bulldozers or asphalt trucks. And I think really the fact that many of these roads heal each season through the regrowth of vegetation is something to celebrate and not litigate. And, in fact, as ONDA emphasizes in their briefing that their NEPA claims must be analyzed in the context of the substantive law here, the Steens Act, I would ask the Court to really take a close look at the Act itself. We've provided the Court the legislative history of the Act and the fact that it was intended in 2000 to be a new way of doing business by the Clinton administration. And as Representative Walden said, it was written by the people most effective. And as Representative DeFazio emphasized, those same people were significantly impacted by the legislation. They traded thousands of their acres of land to be able to facilitate the creation of a wilderness, the first of its kind, 100,000-acre no-grazing wilderness. They agreed to close over 100 miles of roads in that wilderness to create it. But to find that cooperative solution for the community and all the diverse interest holders at stake, they negotiated in the final compromise version of the bill that we provided the Court specific protections against any kind of road closures or road use restrictions in the comprehensive management area. That was an important negotiated protection that was really important to the local stakeholders, important to the county. So I want to look at the Act here with the Court for a minute. Plaintiff talks a lot about Section 102A, which explains the purpose of the CMPA to conserve, protect, and manage the long-term ecological integrity. But Section 102B states the objectives to further that purpose, and consistent with such purpose, the Secretary shall manage the CMPA for the benefit of present and future generations to do, among other things, promote grazing, recreation, historic, and other uses that are sustainable, and to ensure the conservation, protection, and improved management of the ecological, social, and economic environment. And finally, to promote and foster cooperation, communication, and understanding to reduce conflict on the mountain. So that leads us to Section 131, the Advisory Council itself. The county appoints one private landowner, two grazing permittees, and a recreation permit holder. Could you just capsulate for us what it is you're exactly complaining about? I know you're complaining about not being consulted, but about how many roads and what is the character of the roads that you think shouldn't have been closed. You know, for right now, I'd really like to focus on – we're complaining that the BLM did a gold standard process, exactly what Congress wanted when it developed this route inventory. It was unanimously endorsed by the Advisory Council. I don't understand what you're talking about. So you're not complaining about anything. It's the back end of the process in 2014, when the separate recreation plan decision was made to close routes, which was not done in consultation with the Advisory Council. Okay. So how many routes are there and what are they? There's about roughly 25 to 30 miles in play as far as what was closed in the recreation plan. Okay. And were they these things called historic roads for the most part, or what? Some of them are the obscure roads, which the BLM very much said in the original transportation plan were difficult to locate on the ground. I mean, they disclosed that as part of the environmental baseline. And that's really a key here as far as what was disclosed in the original plan, is that the BLM more than adequately disclosed the baseline, and it was more than adequately open to the public. There's tons of public hearings, publicly noticed Advisory Council meetings. So you're supporting the BLM. You're really not complaining about them. No, we are. All right. So I'd like to hear about the part where you're complaining. To be perfectly frank, we think that it was a litigation decision by the BLM to close the roads that they did in 2014. We think it was an extension of an offer of compromise to plaintiffs. And we disagree with it. We think that it shortcutted the Advisory Council process. But we wholeheartedly support the Advisory Council process that occurred in inventorying these routes. It was a gold standard public process. Unanimously, by all four of the members that the Oregon's governor appointed to the Advisory Council, including two environmental group stakeholders that a democratically appointed or elected governor in the state put on that Advisory Council, they all agreed with it. Nobody disputed it. There was no controversy about the route network. The only person that disputed it is the plaintiff. You're supposed to be arguing cross-appeal, but you're not arguing cross-appeal. No, three-quarters of our brief was devoted towards defending. I know it was, and I don't know why, because you claim to be a cross-appealer. We're both. We're an intervener defendant. We intervened in the case to defend, and it wasn't until after the CRP came into this case that we asserted a cross-claim. We gave you extra time on the theory that you were cross-appealing, so maybe you should cross-appeal. Your Honor— If you were an intervener, you wouldn't get extra time. If you were just defending the document. That's fine, Your Honor. With respect to the cross-claim, again juxtaposing it with the other process that went on there, Your Honor, there was a week and a half that was given to the Advisory Council to try to decide whether to do this. The Advisory Council asked for more time. They were not given a chance to make formal recommendations as they did for the transportation plan, and that's really what we're complaining about in that particular sense is that they didn't give the Advisory Council— So what would be the correct—if we agreed with you that the consultation, which did happen, was inadequate, what would be the bottom line result in your view? We're seeking partial vacature of the CRP, the recreation plan, and a remand so that that consultation can occur. It would be the same type of result if you had a NEPA process and the agency with that wholly— So if—let me— Go ahead. I have a following question. If we were to agree with the plaintiffs that the NEPA analysis was insufficient, would this consultation automatically occur again when the new NEPA process began or not? That is, is it—would there be a necessity for a separate consideration of your concern in that event? Yes, it would. I mean, this court's decision, if it were to remand, it would need to allow BLM to consider both sides of it as far as whether they should do any— Well, that's why I'm asking whether we would even have to reach your claim insofar as it is a separate complaint about the result that occurred here if the whole thing were going to be done over again. I think you do, because to be perfectly blunt, we think—the public has been enjoined from using roads that were done through this process with the advisory council, and that is directly contrary to congressional intent. The public, for now 10 years, has not been allowed to use roads. Well, I understand that, but maybe we're not communicating because the premise of my question—and I'm not saying that we've decided anything. I'm just trying to figure out how we would structure a decision in different circumstances. One of those circumstances would be if we were to agree with the plaintiffs and send it back for a do-over. Wouldn't that satisfy your interest in being consulted again? Because wouldn't that happen again as part of the process? Or am I mistaken about that? I think it depends on the grounds on which you decide the case. I mean, because if it has to do with the question of the existence of the routes and there's any prohibition on the use of the base routes that were done, then it effectively leaves us in the same spot we're in now where the BLM has closed roads. And so it really depends on how the court rules and what injunctive relief might come as part of the remand. I mean, again, I would just emphasize that Congress was very clear that no public restriction on the use of any existing roads was supposed to occur. And this idea of a referendum on these types of routes that the plaintiffs are trying to have here, it's just—it's inappropriate. I thought Congress, specifically, the whole point of the Transportation Management Plan was to decide which roads to close, if any. And your position is none. Actually, if you read it, maintenance and improvement are the two things we're supposed to consider before closure. I mean, Congress said improvement. I mean, there's nothing that stops BLM from improving the roads. But what I'm saying is it seems to me your position is that they can't close any roads. No, that's absolutely not. In fact, we've endorsed—the Advisory Council invited people to request route closures based on site-specific conditions. Again, unanimous, unanimous among everybody on this MAC, including the environmental interests, to request that of BLM based on site-specific factors. And we totally endorse that. As long as it goes through the Advisory Council process, that was adopted in the TMP itself. And we've indicated that and agreed. As I understand it, the bottom line was that they left everything open but these 25 roads, and you're complaining about the 25 roads. Again, it's a problem. So you're saying there are other roads that maybe could have been closed that would have been okay? As long as it follows the process and it's vetted through the interests that Congress wanted it to be vetted through in the Advisory Council, yes. We're comfortable with the Advisory Council giving BLM good advice on whether these roads are important to all the varied interests that are on that Advisory Council. What exactly happened here? They did—you're just saying that they went too late to the Advisory Council. Basically, yeah. A week and a half before they closed the comment period and ignored their request to have more time so they could give them formal recommendations. I think the Semonite case is really helpful for us here, the ones that they brought in from the D.C. Circuit. Because, I mean, they highlighted how important the Advisory Council was in that context.  I'll waive my rebuttal time. Thank you. You've exceeded your time by quite a bit. Thank you. Thank you. And we will hear now from Mr. Martin, I believe. Good morning, Your Honors. May it please the Court. Sean Martin from the U.S. Attorney's Office for the Federal Defendants and Brad Grenham from the Interior Solicitor's Office is at Council table. As the Court knows, the focal point of this appeal is the IVLA's 2014 decision on the legal issues that the District Court remanded for its consideration. Is that right? Or is the focal point the way old environmental assessment that's been litigated back and forth for all these years? And as I understand it, their central point is that that was inadequate and that more NEPA analysis needs to be done, preferably, they say, in an EIS. Well, go ahead. Pardon me, Judge, but the District Judge decided that the IVLA ruling was final agency action, and I believe Onda's conceded that the TMP decision from 2007 is not what is under review here. But what IVLA looked at in 2014 was BLM's baseline, the baseline that BLM relied on when it did its travel management plan analysis and reached its decision in 2007. And that discussion in the IVLA ruling, which you're reviewing under APA standards, that discussion is at ER 263 through 66. Yes, I know. Okay. Does that answer your question, Your Honor? Well, somewhat, but you're essentially saying that we're reviewing an appellate decision. If we were to go back to the line of inquiry that Judge Graber has been engaging in, if we were to conclude that it was inadequate, then what? That doesn't mean that either the EA is going to get redone or that the environmental impact statement is going to get done. It's just that the appeal board is now going to rethink the 2007 analysis? It would probably depend on how you come out. But if the Court disagreed with IVLA, thought IVLA was arbitrary and capricious in how it looked at BLM's baseline, then it could either go back to IVLA or more likely would need to go back to the BLM, depending on where the Court comes out. If there's a belief by the Court that there really needs to be photo points, you know, at each segment of each route across this 500,000-acre area, then that would – I guess we're at square one. But what I think the record shows us – Or if we were to determine that an EIS should have been done, then that would obviously have to go back to BLM. For that determination. Yeah, if you believe that IVLA was arbitrary and capricious in its analysis of the intensity factors in its 2014 decision and that the context and the intensity required an EIS, then it would need – again, we'd need to be at square one, Your Honor. But if I could follow on, Judge Graber, your point about EIS, our view is, gosh, the IVLA had a rational basis to affirm BLM use of an EA. You know, this Court's case law is pretty clear that if a project basically amounts to a status quo or it conforms with existing land use patterns, that favors preparation of an EA. And I would point out that ONDA, through its counsel, in its comments on the EA back in 2007, took the position that BLM, quote, would do almost nothing to change the existing situation, ER-979, and that the BLM proposal separately in the same letter would, quote, be, quote, essentially a no-action alternative. So what that tells us is even back during the NEPA process for this travel management plan, ONDA wasn't complaining about the baseline. ONDA had a closure alternative that it wanted BLM to adopt. And the record shows us that BLM considered the ONDA alternative in detail. That was alternative C. Now, in terms of the intensity factors requiring an EIS, BLM certainly wouldn't dispute that the Steens area has many unique characteristics. However, IVLA wasn't arbitrary in recognizing that with reference to sage-grouse. And its discussion, the IVLA's discussion regarding sage-grouse intensity factors at ER-27172, is that you have primitive roots that are little used that are closed half the year. You have large blocks of undisturbed habitat in the CMPA because of the Steens Mountain Wilderness. That's 175,000 acres of public land out of 428,000 acres total of public land in this area. You also have studies in the record showing that roads, especially less-traveled roads, at the heart of the network here, are not negative influences on sage-grouse breeding areas. And you don't have any concerns in the record from ODFW, which is the state wildlife agency. This is why I have a hard time separating, thinking that what we're reviewing is this appeals board later decision because every question I want to ask seems to go back to what the BLM did. For example, could the BLM, as I understand their major complaint here, it's that because of the maintenance permit. First of all, they write that the transportation management plan itself authorizes level 2 maintenance and no further review needs to be done to do that. Is that correct? That's not correct across the board for routes that are in wilderness study areas. Those aren't permitted to be maintained with mechanical means because of the non-impairment standard. So if we're talking about any routes... But that's in the existing travel management plan, I presume. No? Well, my point is only that level 2 maintenance isn't authorized for every single route that was identified in the travel management plan. No, but I think the question is, in those areas where it is allowed, it's just allowed. They can just go do it without asking or getting any further analysis. That's correct. Unless we're talking about special maintenance for heavy vehicles for a horse gatherer or some sort of prescribed project, that would require, if it's going to be beyond level 2 maintenance. But I would also point out that prior to the travel management plan, these were routes, the routes BLM identified were routes that were already open to motorized travel and that BLM was able to maintain those routes, even though they weren't formally identified on a final map. How do we make any of these determinations without knowing what is a road? Isn't that sort of where some of this is still ambiguous? I don't know that it is, Your Honor, because it's really uncontested before you today that the Steens Act allows for motorized travel on trails and roads. And it's also been plain from the get-go that BLM told the public that, you know, 80% of the routes in the Steens area are primitive routes that are maintained more by use than by equipment that are accessible by a high-clearance vehicle. But that's why I was about to ask that there is nothing in the traffic management plan that requires that that condition be maintained, i.e., that these 80% of the routes that are primitive routes, or describes which they are, but also says that these 80% of the routes can't, are only maintained by people using them, and there's also no, as I understand it, limitation on use on any of them. Well, if we're talking about the historical routes, those are only for the livestock permittees. No, I wasn't talking about that. I was talking about the 80% of the primitive routes that you were talking about. Well, if they're level-two routes, Your Honor, yes, that they are open to public travel. They're not limited to, you say 80% of them are only maintained by users, but there's nothing in the plan that requires that. Well, to be clear, BLM told the public in the EA that they're largely, they're mostly maintained by vehicle use rather than— Now, but the plan doesn't require that. Right, it— It doesn't, you say there's no change, but the current condition is that these routes are very rarely used and that they are maintained just by use. Not just by use, but largely by use. And nothing in this plan maintains that condition. So when you say that they're as a requirement. So when you say there's no change, there is a change because there is nothing that requires that those primitive roads be left in the primitive condition they're in. Right, but that isn't a change, Your Honor, because before the travel management plan, these were BLM routes that— Well, I guess that depends on whether you think what was being preserved was what's on the ground or something that's, you know, theoretically possible, but not on the ground. Well, I certainly can tell you that the Steens Mountain Advisory Council, which not only represents environmental interests, there are two environmental representatives, but permittees, recreation permit holders, tribal interests, fishing interests, that that advisory council, after many months of meetings with BLM, hearing about the routes and BLM's route plan, unanimously endorsed BLM's baseline for the travel management plan, and it endorsed an alternative to keep that status quo network open to public motorized use, you know, the 555 miles. Including the fact that the current condition is not going to be— doesn't need to be maintained. I mean, isn't that the—the problem here is that, A, we need to know what the current conditions are, and, B, there needs to be— What disturbs me is your notion that nothing is changing when—without a focus on what is there now. I mean, and this goes—then morphs into this decision that a road is not what's there, it's what is authorized to be there. Right. Well, just again, I may not be getting through, but part of my point is, even before the travel management plan— I understand that, but that's because there's still a difference between a focus on what was authorized and what's actually there. Well, my point is there isn't a difference, because if BLM didn't have a travel management plan and chose to maintain a primitive route without this travel management plan, it could have done so. So this doesn't allow some— I'm sorry, maybe I misunderstood. I thought the statute required a travel management plan. It certainly did. It certainly did. You told me that it couldn't, so it couldn't have done what you said. Before the Steens Act, before enactment of the Steens Act, it certainly could have. Well, but the Steens Act is there, and so that's part of what we have to think about. We can't assume it away. But my point is, before the Steens Act, BLM could maintain the primitive routes if it needed to do so. But the Steens Act—  Right, my point is what the travel management plan allowed was that network that carried forward allowed it to be maintained for public motorized use. Let me make this point as well. BLM chose not to, as you well know, inventory by ground photography every eighth of a mile segment of what it identified in the travel management plan decision. But it kind of— Did it inventory it in any way? My understanding is that it took some aerial photos of some roads. Right, right. And it used some anecdotal information of some roads. Well, many of the roads aren't in dispute. You know, 55 miles is the main loop road, which gets almost all of the traffic. And then there's 55 miles of secondary roads. And then what BLM did was it focused on the newer routes, keeping in mind that the Steens Resource Management Plan, which was reached after an EIS process in 2005, that already identified 501 miles of routes. So what the travel management plan did was found additional routes, talked to landowners, verifications, looking at aerial photography. What does identified mean? Put it on a map? Well, for example, it involved Harney County and livestock permittees having meetings, discussing primitive routes that they know of that they use, putting them on maps, and BLM verifying that information with its targeted boots-on-the-ground inventory procedures. And I would point this out. Even ONDA's ground photographs, which were before the BLM, and they were before the Steens Mountain Advisory Council back in 2007, ONDA's photos don't undermine BLM's baseline of primitive routes that might be rocky, that might be high-clearance access, that might be trails, because they show a route on the ground. And page 22 of our brief to this court shows two of the routes that ONDA is apparently saying are nonexistent and that prove an irrational baseline. But just look at the photos. There are several hundred pages in ONDA's excerpts of record of these roads, and our point is they're there. And those routes, those photos don't undermine BLM's baseline. They confirm it. These aren't roads that are drivable by a standard city vehicle, but it's a two-track. It's obviously there, and it's not nonexistent. Before you sit down, what is your response to Harney County's assertion that it's essentially reversible error to have given them only a week and a half to the advisory council to respond to the final proposal? Well, Judge, in any event, it's harmless error because Harney County submitted a comment letter regarding the CRP in early 2015. So Harney County's interests weren't impaired because Harney County had time to file its own comment letter and make its points about its concerns about closing these so-called obscure routes. You made the point too as well, Judge, that BLM did consult with the Steens Mountain Advisory Council in 2015. It had two days of meetings, and BLM wasn't mandated to agree with Harney County's arguments or its views. I mean, what BLM did in 2015 was looked at those obscure routes anew. In light of what IBLA did in 2014, it looked at those routes and, route by route, made a decision about whether it would keep them open or not. Can I ask for your answer to the structural question, i.e., what's logically prior here? Do we need to decide at least the issue of what's a road or a trail under the Steens Act before we can decide to meet the issue, or don't we? I think so. This Court defers to IBLA interpretations of statutes that are administered by the Interior Department. And here, IBLA reached a permissible interpretation of the statute that's entitled— That's not what I asked you. What I want to know is do we need to decide that question in order to meaningfully for us to review and for you to respond with regard to the NEPA question? Yes, you do, Judge, because you look at NEPA claims with a lens towards the underlying substantive statutes. Here, the Steens Act is a critical backdrop and framework for a NEPA review. And here, the Steens Act allows for motorized travel on trails and roads. So it's critical when you look at that baseline to understand that the Steens Act allows identification of motorized travel even on primitive trails and primitive roads. But does that override the requirement of analysis that NEPA seeks for environmental effects of what is proposed? No, it doesn't override it. It doesn't override it, but it exists in harmony with NEPA. As I understand, the most recent interpretation of the statute is not based on whether there's a primitive road there. What's the language? Anything that was authorized or something like that? A matter of record. A matter of record. And that's a very peculiar standard. As you described the method of finding out what the roads were, many of them were sort of in people's heads. So what record are we looking at? Well, we're certainly looking at those maps that were submitted for BLM review from ranchers, the Hammond family.  This is not a historical record that preexisted the statute as to what the roads were. That's not what we're talking about. We're talking about roads that what IBLA ultimately termed as a matter of record if it was in existence as of the enactment of the Steens Act in 2000. So IBLA credited evidence such as landowner accounts, you know, subject to BLM verification. There isn't a record, in fact. There is no record. Of what? Of these roads as of 2000. In 2000, there was no record of where the roads are. Well, if you mean ground photos. Usually you say it's a matter of record. There is somewhere a record that you're looking at. Well, right. And what IBLA, we believe, rationally found was that landowner accounts, you know, interviews of permittees, aerial imagery. That's not a record. Maps. You mean it's a matter of record now. It wasn't a matter of record in 2000. There was no record in 2000. Well, IBLA believed that there was an adequate record of that given these various factual points. I'm really confused. I thought that we were referring to some existing compendium in 2000. There is no existing compendium from 2000. The maps were incomplete. But there was no record. It was scatter shot. All right. So what record? They're looking at what's a matter of record. What record are they looking at? They're looking at the maps that BLM reviewed prepared by landowners, by Harney County, by livestock permittees, by ONDA, BLM's own field notes, the resource management plan map from 2005, which identified 501 miles. So the matter of record is anything that BLM says has now made a record of, even if it never existed before? Well, based on review of other facts, on aerial imagery or accounts from the local people who use the routes. And I would also point out to Judge Berzon that for at least some of these routes, ONDA took the position that it would accept recollected uses of the historical routes by livestock permittees. Well, fine, but it is a very strange use. I mean, apparently they're saying it's something different than what roads are actually there, findable. It's instead whatever is a matter of record. I thought, therefore, that there was some record we were looking at. Well, let me say this. For these most hotly contested routes, the obscure routes where IBLA changed its view in light of Judge Papik's remand, IBLA reached one ruling in 2014 regarding the obscure routes, and then it revisited that in light of Judge Papik's remand, where Judge Papik noted that trails and primitive roads are available for minorized travel. But my point is that in 2015, in light of what IBLA did, BLM looked at those obscure routes one by one, and it had detailed route-by-route information. And BLM in 2015 in the CRP, that's part of this appeal as well, closed many of those obscure routes because it didn't find a public purpose. It didn't find that they were being used, but for those that BLM left open, the record before BLM and the CRP decision in 2015 shows their existence, shows their utility. We're talking ground photographs and aerial photographs and multiple uses. It has nothing to do with this matter of record definition, though, does it? Well, it's certainly part of this appeal, Your Honor. What's part of this appeal? Onda's claims under NEPA and the Steens Act and other statutes against the 2015 CRP decision. My point is the obscure routes that IBLA reopened in 2015 were completely revisited in 2015 by BLM. So to the extent that you're uncomfortable with this matter of record where there's nothing whatsoever, you know, it's that something that BLM looked again at through a public process in 2015. Thank you, counsel. Thank you. Thank you, Your Honors. The big problem with BLM's focus on the IBLA's 2014 decision is that that decision never went through a public NEPA process. It's been more than 12 years now since the first EA came out for the travel management plan in 2007. Having been strung out for this many years and with this much controversy and uncertainty on the record as to what exists out there regardless of what label we provide to these different routes, that's why Onda submits that it's crucial for the full and meaningful public process. Do we have to define what a road is or either defer to the definition that has been provided in the 2014 opinion or by some other means? Do we have to figure that out before we can analyze the rest of the claims? For purposes of NEPA, Your Honor, no, you do not. However, if Congress had intended for the word road to mean something different than the way BLM had been using it on the public lands for the last 40 years, it would have said so, and it didn't. But why don't we need to decide it? If we want them to have a baseline of roads, don't we want to have to know what a road is? Oh, I think the Court absolutely can decide what a road is, yes. I'm asking how we can avoid it. Avoid it, yes. Well, the term has, the original definition comes from Congress in the legislative history of FLPMA in 1976. BLM has never defined a road as something that exists on paper. This definition came out. But basically, your basic submission is that there was an inadequate baseline as to existing roads. Correct. Right. Don't we have to know what a road is to know what the adequate baseline has to cover? I think what you have to know, Your Honor, is whether it was reasonable under the facts of this case for BLM to ignore 2,700 pages of credible information collected according to the agency's own definition of a road and protocols. Their definition now is it doesn't matter what's there. It only matters what's, quote, a matter of record. And that seems to have something to do also with whether there's a change or isn't a change. Because, I mean, their fundamental reason why there's no need for an EIS, as I understand it, is because their proposal isn't going to change anything. And that depends on what you're looking at, doesn't it? Whether you're looking at whether what's there or what theoretically could be there. I'd go a step further than that, though, Your Honor, because BLM admitted in the EA and in other places in the two decision records that it was, in fact, adding new routes that it discovered or adding routes that it described as pioneered. Well, because that seems to be this definition of a matter of record. There isn't an existing record. It's whenever somebody puts on the record. Well, and that definition came out not in a public process but years after the public process. All right. One last question, I hope. Just technically speaking, I was surprised to learn that what we're reviewing is only this 2004 IPLA. 2014, I think. 2014, I'm sorry, IPLA document. Is that correct? I don't think so, because the 2014 IPLA decision has to rely on the actual record of what the conditions are of routes on the ground. Otherwise, the 2014 IPLA. Well, yes, but that is inconsistent with saying that what we are reviewing is not the original environmental assessment or the original TMP but only this analysis of it. Well, for APA purposes, of course, a final agency action is not just that decision document with the signature on the bottom line but the underlying findings, conclusions, and environmental analysis. So in the context of a NEPA case. In the end, you're not disagreeing that the final agency action is this 2014 document. Right. I thank you for your time. Thank you very much. As you can tell, this is a challenging case, and we appreciate very much the arguments of all counsel. The case is submitted, and we are adjourned.
judges: Graber, Berzon, Robreno